**FILED**

**MAR 14, 2013**

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| EDDIE E. ACORD and SHARON K. ACORD, husband and wife, | ) ) ) | No. 30323-3-III |
| Respondents, | ) ) | |
| v. | ) ) | |
| | ) | PUBLISHED OPINION |
| BRITTON K. PETTIT and LYNNETTE F. PETTIT, husband and wife, | ) ) ) | |
| Appellants. | ) ) | |

SWEENEY, J. — The trial judge here awarded title to a strip of land to the plaintiffs after concluding that they and their predecessors had adversely possessed the property. The appellants challenge the factual and legal basis for the court's ruling on a number of grounds. We conclude that the judge properly admitted testimony, from a previous trial, of a witness who had died. We conclude that the court properly admitted the opinions of the respondents' expert on logging operations on the disputed property. And we ultimately conclude that the court's findings support the necessary elements of adverse possession. We then affirm the judgment of the trial court.

FACTS

Eddie E. Acord and Sharon K. Acord and Britton K. Pettit and Lynnette F. Pettit own adjacent property. The Acords' property is situated to the north of the Pettits. This dispute is over an approximately 100-foot strip between the two parcels. The contested property is forest land.

The Acords purchased 180 acres of property from Fred and Carol Chandler in September 1991. The Pettits purchased 20 acres of property that borders the Acords' property to the south, from Leigh Robertson on August 21, 2000.

The Pettits obtained a permit to log their property in 2005. Walter Acord then logged his father's property to a fence line in the contested area. This dispute followed. The Pettits filed a stumpage lien on March 21, 2006, and claimed title to the logs the Acords had harvested between the section line and the fence line. The Pettits sued in small claims court to recover the value of the logs. The Acords responded with a suit to quiet title to the disputed property by adverse possession. They prayed for damages from the timber harvest that the Pettits interrupted and for release of the Pettits' stumpage lien.

At trial, the Acords planned to use the transcript of earlier testimony of their predecessor, Fred Chandler, to show the necessary use of the disputed strip of land. The earlier 1996 suit by the Acords established ownership by adverse possession against their neighbors to the east, Carl and Donna Thomsen. Fred Chandler had died in the interim.

2

The Pettits moved to prohibit use of this prior testimony. They argued that his testimony in the previous trial was irrelevant because that suit was over an east west boundary whereas this suit was over a north south boundary. And they argued that his previous testimony failed to satisfy the requirements of ER 804(b)(1)[1] because they had not been able to cross-examine Mr. Chandler. The Acords responded that Mr. Chandler's 1996 testimony was relevant to the current case because it included information about when fences on the property were built, by whom, and for what purpose, including that portion of the fence south of the Acords' property that played a role in the judge's decision here. The judge agreed with the Acords and ordered publication of the 1996 transcript.

During the earlier 1996 trial, Mr. Chandler testified that he purchased 160 acres from John and Jacqueline Sperber in 1972. In 1974, he purchased an additional 20 acres from Grouse Creek Associates. He testified that the property did not have a fence in 1974 and that he hired Jim Bosingham, a surveyor, to establish the boundary of his property. Mr. Chandler marked the boundary line with a fence after the perimeter was

---

[1] ER 804(b)(1) states:

**(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

surveyed. Exhibit (Ex.) 16, at 11. He testified that he fenced the east line and then continued the fence to the southwest corner of the property where he continued the fence along his southern line. He testified that he fenced the south side of the property he purchased from Grouse Creek Associates according to the unofficial "survey on the south side of my property at the same time." Ex. 16, at 34. He testified that, when he sold his property to the Acords in 1991, the fence was still in good repair and that he had regularly maintained it once or twice a year. Ex. 16, at 22, 24. During cross-examination in this first trial, he twice reiterated that he fenced his southern border in 1974 and regularly maintained the fence. Ex. 16., at 34, 35, 43.

During the trial giving rise to this appeal, witnesses testified about maintaining the boundary fence. Walter Acord was an adult when his parents bought the property. He testified that he moved to the area in 1996 and that he worked on the southern fence and rebuilt the gate on the south easement road. Eddie Acord also testified that he maintained the southern fence in the disputed area, explaining that he "cut trees off of it and stuck it back up." Report of Proceedings (RP) at 40.

The Acords presented testimony that the disputed area had been used to cut wood. The Acords presented testimony of an expert, Al Lang. Mr. Lang had worked for the Department of Natural Resources for over 30 years as an engineer, surveyor, and forester. He then worked as a private forest consultant after retirement. At trial, he identified

4

photos of 12 stumps he analyzed in the disputed area. He testified that he compared the stumps between the survey line and the fence line (the area in dispute) with comparable property that had been logged in 1976. He concluded based on this experience and these observations that the stumps in the disputed area had been cut between 1976 and 1980. And he observed that the stumps had been cut to the fence line.

The Pettits objected that the testimony did not pass the *Frye*[2] test because there were no peer reviewed articles to support his method of dating the stumps in the disputed area. The Acords responded that the *Frye* test did not apply and Mr. Lang simply had to show that he had knowledge and expertise beyond the average person. The court agreed with the Acords and allowed Mr. Lang to testify, "There's no peer review articles for sure, but again, [Mr. Lang's] been a forester in Idaho and Washington and he has been working in this part of the area for again about forty years. So for those reasons in the belief that the various environmental factors are much the same, I'll allow the opinion." RP at 128.

At the end of the trial, the court entered conclusions of law including:

- The Chandlers and then the Acords had exclusive possession of the Acord property, including the contested area, for a total of 21 years, from 1974 to 1995, as evidenced by the boundary fence to the south, which established exclusive dominion. Clerk's Papers (CP) at 375-76.

---

[2] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

5

- The Acords' possession was actual and uninterrupted because they lived on the property and the Chandlers and then the Acords made ongoing use of the contested area by logging and cutting firewood. CP at 376.

- The Acords and the Chandlers treated the contested area as "theirs as against the world throughout the statutory period." They had it fenced, and kept the fences maintained. Their overt actions prove the hostility and claim of right element of adverse possession. "Their possession of the wooded area which included the contested area, was clear to the world." CP at 376.

- The acts of the possessors were sufficiently open and notorious to manifest to others a claim to the contested area, given the character of the land.

- Vesting of title occurs once the 10-year period of adverse possession is completed. The Acords' claim to the contested area dates back to 1974 and therefore their interest in the contested area vested in 1984. CP at 377.

- Leigh Robertson interrupted the use of the eastern part of the Acords' property in 1995 by bulldozing the fence. Following this incident, the Acords stopped making use of the eastern part of the contested property. CP at 377.

- The Pettits and Leigh Robertson have made exclusive use of the contested area since 1995. The Pettits have adversely possessed the entire contested area since August 2000. CP at 377-78.

- The Acords acquired their title to the contested forest land by adverse possession under the law in effect in 1984. RCW 7.28.085 did not take effect until June 11, 1998. CP at 378. The Pettits cannot claim the contested area by adverse possession because they have not made substantial improvements under RCW 7.28.085 and are not record holders. CP at 378.

The court then quieted title to the disputed property to the Acords and released the

stumpage lien. The court ordered that the Pettits were "forever barred" from asserting

any right or interest to the disputed property. The court also dismissed the Acords' claim for money damages and attorney fees and costs.

## DISCUSSION

### ADVERSE POSSESSION

Essentially, the Pettits contend that the Acords have not made a sufficient showing to establish ownership by adverse possession based on the evidence that should have been admitted and considered by the court.

To establish their claim of ownership by adverse possession, the Acords had to show possession that had lasted for 10 years and that was (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile. *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984); *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989); RCW 4.16.020. The Acords can also "tack" the possession of a predecessor in interest to establish the use required for adverse possession. *Roy v. Cunningham*, 46 Wn. App. 409, 413, 731 P.2d 526 (1986); RCW 4.16.020.

Open and notorious requires a showing of use consistent with ownership. *Chaplin*, 100 Wn.2d at 863. The use and occupancy only needs to be like that of a true owner, considering the land's nature and location. *Id.* at 861. Hostile requires a showing that the claimant treated the land as his own for the statutorily required period. *Id.* at 860-61.

7

*Admission of Fred Chandler's Testimony*

Fred Chandler's testimony, in the earlier 1996 suit, was central to the Acords' claim of adverse possession. The Pettits contend the court erred by admitting that transcript. They argue that Mr. Chandler's testimony was inadmissible hearsay prohibited by ER 804(b)(1)[3] because the earlier trial related to a different parcel of property and his testimony was not subject to adequate cross-examination.

The admission of this testimony was a discretionary decision vested in the trial judge responsible for trying the case. *State v. Mason*, 160 Wn.2d 910, 922, 162 P.3d 396 (2007). Our review is therefore for abuse of discretion. *State v. DeSantiago*, 149 Wn.2d 402, 411, 68 P.3d 1065 (2003). Former testimony of an unavailable witness is admissible if the party against whom it is offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" when the witness testified. ER 804(b)(1); *DeSantiago*, 149 Wn.2d at 411. The question facing the judge here was "whether the questioner had a substantially similar interest in asserting that side of the issue." *United States v. DiNapoli*, 8 F.3d 909, 912 (2d Cir. 1993). The proceedings did not have to be identical. *State v. King*, 113 Wn. App. 243, 292, 54 P.3d 1218 (2002).

---

[3] Declarant unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity.

Also the "predecessor-in-interest" language of ER 804(b)(1) has been interpreted broadly by federal courts and Washington state courts. Indeed, the courts have dispensed with any technical and narrow definition of the term and instead examine whether the party against whom the evidence was previously offered had an opportunity and similar motive to develop and challenge the testimony by cross-examination. So a previous party having like motive to develop the testimony by cross-examination about the same matter is a predecessor in interest to the present party for purposes of this rule. *See State v. Whisler*, 61 Wn. App. 126, 135, 810 P.2d 540 (1991) ("no legitimate rationale" to disallow former testimony "so long as the 'opportunity and similar motive' requirements of ER 804(b)(1) are met"); *Allen v. Asbestos Corp.*, 138 Wn. App. 564, 579, 157 P.3d 406 (2007) ("the predecessor in interest exception requires the predecessor to have the opportunity to examine the witness"); *Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir. 1978) ("'if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party'" (quoting CHARLES MCCORMICK, HANDBOOK OF THE LAW OF EVIDENCE, § 256, at 619-20 (2d ed. 1972))); *Clay v. Johns-Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983) ("'the previous party having like motive to develop the testimony about the same material facts is, in the final analysis, a predecessor in interest to the

9

present party'" (quoting *Lloyd*, 580 F.2d at 1187)). In *Clay*, the court refused to endorse "'an extravagant interpretation of who or what constitutes a "predecessor in interest," it preferred one "that is realistically generous over one that is formalistically grudging.'" *Clay*, 722 F.2d at 1295 (quoting *Lloyd*, 580 F.2d at 1187). This common sense practical application of this rule can easily be applied by trial judges exercising their discretion in these matters.

ER 804(b)(1) does not mechanically define the extent to which the issues in the former proceeding must correspond to the issues in the later proceeding. And published cases suggest that the issues need not be identical. *King*, 113 Wn. App. 243 (videotape testimony of witness's former testimony held admissible even though issues not identical); *Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385 (5th Cir. 1980) (testimony of former victim of a similar accident at same railroad crossing allowed); *Young v. Key Pharm., Inc.*, 63 Wn. App. 427, 819 P.2d 814 (1991) (testimony of former witness in almost identical products liability case allowed).

The Pettits argued that they had no predecessors in interest because the southern boundary of the Acords' property was not an issue in the former case and therefore there was no motive for thorough cross-examination of Fred Chandler relating to evidence about the southern line. CP at 294-99. The judge reviewed significant portions of that testimony on the record and concluded that the Thomsens' interest and motives in

10

examining Fred Chandler "were the same as those of the party against whom the witness' testimony is later offered." RP at 297-303. And he found that "[t]he motive was to call into question how the fence was constructed, what the purpose of the fence was, where it was put down." RP at 302.

We conclude then that the court's reasons for admitting this prior testimony were tenable. *See O'Banion v. Owens-Corning Fiberglass Corp.*, 968 F.2d 1011 (10th Cir. 1992) (no error in admission of trial testimony given by an expert in a former case where the plaintiffs' predecessors in interest had an opportunity to thoroughly develop the expert's testimony through cross-examination at trial). The Thomsens, who were defending an adverse possession claim to the Acords' east line had a similar opportunity and motive to challenge Fred Chandler's statements pertaining to how he established his east and south lines based upon the construction of fences along the east and south lines of the Chandler (now Acord) property.

The same fence was implicated in both cases and questions as to its location, when it was built, and how often it was maintained was then relevant in both trials. The attorney for the defendants in the earlier adverse possession suit cross-examined Mr. Chandler about the relevant details of the fence. He questioned about when it was built and how often it was maintained. Ex. 16, at 32-44.

11

*Elements of Adverse Possession*

The court concluded that this boundary fence was evidence that the Chandlers and their successors in interest, the Acords, had exclusive possession of the Acord property, including the contested area, for 21 years, starting in 1974. The court relied in part on *Wood v. Nelson*.[4] There the court held that a fence that had separated property for more than 10 years, combined with the possessor occasionally cutting wild grass up to the fence line, was sufficient to constitute adverse possession. Because "[a] fence is the usual means relied upon to exclude strangers" and exclusion is another indication of possession, the existence of a fence is dispositive. The court in *Wood* also concluded that

> [w]here a fence purports to be a line fence, rather than a random one, and when it is effective in excluding an abutting owner from the unused part of a tract otherwise generally in use, it constitutes prima facie evidence of hostile possession up to the fence.

*Id.* at 541 (emphasis omitted).

The Pettits argue that the fence here was not a boundary fence, but "a pre-existing containment fence constructed . . . prior to Mr. Chandler's ownership." Br. of Appellants at 7. They argue that without Mr. Chandler's testimony, there is no evidence to support the court's finding that Mr. Chandler constructed a fence on the property. And, while that is certainly a tenable argument, it is one that was ultimately rejected by the trial

---

[4] *Wood v. Nelson*, 57 Wn.2d 539, 540, 358 P.2d 312 (1961).

judge. The judge rejected both the argument that Mr. Chandler's testimony was inadmissible and he rejected the Pettits' arguments on the significance of that testimony and he was privileged to do just that. *Rognrust v. Seto*, 2 Wn. App. 215, 221, 467 P.2d 204 (1970), *overruled on other grounds by Chaplin*, 100 Wn.2d 853.

There was more than ample evidence to support the court's finding that a fence existed on the property in 1974. First, a number of surveys confirm the existence of the fence. A 1997 survey shows the east fence along the eastern boundary of the Acords' Tax Parcel No. 5230475 extending into the Pettit parcel to the South. Ex. 10. A 2003 survey shows the south fence extending into the Pettits' property from the west. Ex. 11. A 2004 survey of the northeast quarter of section 7 shows an "existing fence" running east to west and located just south of the section line. Ex. 104. And, in his written report, Mr. Lang noted, "[a]n established fence has been the common boundary of this line between various past landowners. A survey . . . placed the line 100+ feet to the North of this common established fence line." CP at 123. Both Walter and Eddie Acord testified that they maintained the fence. And Mr. Chandler testified about the construction and maintenance of the southern boundary fence; he said it was built in 1974 and that he regularly maintained it.

The Pettits point to the testimony of Fred Chandler's son and stepdaughter, Brian Chandler and Jill Metlow, to show that the fence in question was not a boundary fence.

13

Brian Chandler testified that he lived on the property from 1971 until 1987 and denied any knowledge of who built or maintained the fence on the southern part of the property. He also testified that he was only four years old in 1972. Ms. Metlow testified that she was 14 years old when she moved onto the property in 1971 with her parents. She testified that the fence on the southern part of the property was not serviceable and denied that her family built the fence. She also testified that she married in 1973 and moved away from the property. But none of this is helpful here on review. The credibility of these witnesses, the weight to be attached to their observations and opinions, and the persuasiveness of the evidence were all matters for the judge trying the case, not us. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

And the judge considered the testimony of Mr. Chandler's children but found Mr. Chandler's testimony more persuasive. He noted that Brian Chandler was only 6 or 7 years old when his father built the fence and that Ms. Metlow had already moved away. He noted that "[t]he father and property owner, Frank Chandler, operated a dairy farm in his years on the property. He was in a better position than his son and stepdaughter to know whether the boundaries were measured and a boundary fence erected." CP at 372. The court found that Mr. Chandler's testimony was clear on relevant points, particularly that the fence around his property was meant to establish a boundary. The Acords produced sufficient evidence to establish that a fence existed and had been considered a

14

boundary fence. The existence of that fence was dispositive evidence of "hostile" possession. *Wood*, 57 Wn.2d at 540; *Chaplin*, 100 Wn.2d at 861. The fence was built in 1974, was visible to others, and kept in good repair. The fence was treated as a boundary line, not a random line, and is therefore a "'clear assertion of possession and dominion.'" *Danner v. Bartel*, 21 Wn. App. 213, 216, 584 P.2d 463 (1978), *overruled on other grounds by Chaplin*, 100 Wn.2d at 861.

The Chandlers' and the Acords' use of the disputed property was also consistent with the character and nature of the property. This was forest property. The Chandlers and the Acords cut trees and firewood in the area. Mr. Chandler testified that he cut trees in the disputed area around 1984 (Ex. 16, at 13) and Mr. Acord testified that he cut firewood in the disputed area from the time of purchase to the late 1990s. Walter Acord testified that he logged to the south side of his father's property in 1997 and again in 2006. Indeed, the 2006 logging operation precipitated this litigation. Mr. Lang testified that the disputed area had been logged between 1976 and 1980, which brings us to our next point.

EXPERT TESTIMONY

The Pettits challenge the court's finding that the area was logged from 1976 to 1980. They argue that the "sole basis for the alleged logging in the contested area was speculation by an expert, Al Lang." Br. of Appellant at 20. They characterize Mr.

15

Lang's opinion testimony as "junk science" and contend, as they did in superior court, that the judge should have excluded his testimony as inadmissible under *Frye*. *Id.*

Evidence derived from a scientific theory is admissible only if the theory has general acceptance in the relevant scientific community. *State v. Copeland*, 130 Wn.2d 244, 256-57, 922 P.2d 1304 (1996). However, a *Frye* analysis need not be undertaken to admit evidence that does not involve new methods of proof or new scientific principles from which the conclusions are drawn. *State v. Russell*, 125 Wn.2d 24, 69, 882 P.2d 747 (1994); *Bruns v. Paccar, Inc.*, 77 Wn. App. 201, 215-16, 890 P.2d 469 (1995) (*Frye* inapplicable to expert testimony that low levels of chemicals found in the cab of new truck could produce low level sensory irritation experienced by drivers because experts relied on established scientific methods of air sampling, chemical analysis, clinical examination, and questionnaires).

The Pettits mischaracterize Mr. Lang's opinion evidence as "novel" scientific evidence, requiring a showing of acceptance in the scientific community. It is not; and they made and make no showing that it is. Mr. Lang was clearly a well educated and a very experienced forester. He was then clearly qualified as an expert. He compared the appearance and condition of tree stubs and explained in some detail how those comparisons were made, why the stubs had the appearance they had and what, in his opinion, was the significance of all of this. That is classic expert testimony. *Reese v.*

16

*Stroh*, 128 Wn.2d 300, 308, 907 P.2d 282 (1995). And it was admissible if, in the judge's opinion, it would help the trier of fact. *Id.* To characterize these opinions and the basis of those opinions as junk science or scientifically novel is to mischaracterize them. The Pettits made no attempt to show that the factual basis for the opinions (the appearance and location of the stumps) was inaccurate or that the conclusions Mr. Lang drew from that data were illogical or unfounded or scientifically novel. So whether the testimony was admissible turned therefore on the application of ER 702 (testimony of experts).

Again, the judge had broad discretion here. *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001). "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, or training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. Application of the rule raises two questions: (1) does the witness qualify as an expert, and (2) would the witness's testimony be helpful to the trier of fact. *State v. McPherson*, 111 Wn. App. 747, 761, 46 P.3d 284 (2002). "'Practical experience is sufficient to qualify a witness as an expert.'" *Id.* at 761-62 (quoting *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992)).

Mr. Lang easily passes this test. He had worked for 30 years at the Department of Natural Resources as an engineer, surveyor, and a manager of 186,000 acres of timber.

17

He worked for over 15 years as a private forestry consultant. He carefully laid out the basis for his opinions. He testified in some detail about his method of comparing tree stumps on the disputed area with a comparable region along the Spokane River with a similar habitat. He explained that the weather conditions and rotting factors in the two regions were similar and that he is familiar with the region because he has lived and worked in the area since 1966. Mr. Lang's testimony helped the court determine the time frame of logging on the disputed area. There was no abuse of discretion here.

APPLICATION OF RCW 7.28.085 SUBSTANTIAL IMPROVEMENT

The Pettits contend that the court should have required that the Acords show evidence of "substantial improvement" on the disputed property to satisfy the requirements of RCW 7.28.085(1) (requiring "substantial improvements" to prove adverse possession of forest land after 1998). They argue that the "Acords cannot prove an adverse claim by their own use in the 6-2/3 years between their October 1991 move to the property and the June 1998 effectiveness of RCW 7.28.085." Br. of Appellants at 15. They argue that there is no evidence of adverse use by the Acords' predecessors and therefore the Acords have nothing to "tack" to their deficient 6-2/3 years of use. *Id.*

The court concluded, on ample evidence, that the Acords' claim to the contested area dates to 1974 when Mr. Chandler installed the boundary fence. And RCW 7.28.085(4) provides that the statute does "not apply to any adverse claimant who, before

18

June 11, 1998, acquired title to the lands in question by adverse possession under the law then in effect." Here, title vested in 1984, 14 years before the June 11, 1998 deadline set out in RCW 7.28.085(4). *See El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 855, 376 P.2d 528 (1962) ("When real property has been held by adverse possession for 10 years, such possession ripens into an original title."). The *El Cerrrito* court also noted that once a person acquires title by adverse possession, he or she can transfer it to another party without having title quieted in him or her prior to the conveyance. *Id.* The Acords' title by adverse possession up to the existing fence line vested in 1984 and they are not subject to the requirements of RCW 7.28.085(1).

PETTIT ADVERSE POSSESSION

The Pettits also contend that even if the Acords had at some point acquired title to the property by adverse possession, they regained it through their use, color of title, and the Acords' abandonment of the property.

The court concluded that the Pettits and Leigh Robertson, starting in 1995, made exclusive, actual and uninterrupted, open and notorious use of the eastern part of the contested area. It also concluded that the Pettits adversely possessed the entire contested area since August 2000. CP at 377-78 (Conclusion of Law G). However, citing to RCW

19

7.28.090,[5] the court further concluded that the Pettits cannot claim the contested area by adverse possession because they have not made the now statutorily required "substantial improvements" within the contested area. CP at 378 (Conclusion of Law H). The court concluded that they are not holders of record title because a registered land surveyor has not established the boundaries of their property. CP at 378 (Conclusion of Law H). The Acords challenge the court's conclusion that the Pettits otherwise met the elements of adverse possession, as unsupported by the evidence.

The Pettits do not assign error to conclusion of law G; however, they assign error to conclusion of law H and contend they were not "adverse claimants" because they had record title to the property. And the court therefore erred in applying the substantial improvement required by RCW 7.28.085(1) since it only applies to those who claim ownership by adverse possession.

The Pettits refer to Exhibits 10, 11, and 104 to show that the boundary between the properties was established by recorded surveys. They are mistaken. The 1988 survey by Thomas E. Todd surveys the Acords' north property line and notes, "No monument found or set." Ex. 104. Mr. Todd's 1992 survey shows the south corner with the notation, "no monument found or set." Ex. 104. The 1997 survey by Thomas Todd

---

[5] The court cited RCW 7.28.090 when referencing "substantial improvements." Viewed in context, the court intended to cite RCW 7.28.085.

20

again shows the notation at the south quarter corner, "No monument found or set." Ex. 10. And the 1997 survey by Richard Bard shows the east boundary of the Acord property and notes, "No monument found." Ex. 104. A 2004 RFK Land Survey of the Stimson property, west of the Pettits' land, set the north quarter corner of section 6. Ex. 11. But there is no evidence that the common boundary line between the Acord and Pettit properties has ever been surveyed. They have shown neither the substantial improvements on the disputed property required by RCW 7.28.085 nor stakes and boundary markers that might relieve them of that obligation.

The court then correctly concluded that the Pettits failed to establish adverse possession.

ATTORNEY FEES

Both parties request attorney fees on appeal. The Pettits argue that the Acords violated RCW 4.24.640 and are therefore liable to the Pettits for investigation and litigation costs as well as reasonable attorney fees. The Acords contend they are entitled to fees under RAP 18.1 and RCW 4.84.080(2). They also request their costs of appeal pursuant to RAP 14.2 and 14.3.

Under RAP 14.2, we may award costs to the prevailing party. The trial court found that both parties prevailed on major issues in this case and therefore declined to award costs to either party. We agree. Both parties partially prevailed, but neither one

No. 30323-3-III
Acord v. Pettit

substantially prevailed. Accordingly, neither party is entitled to attorney fees or costs under the cited provisions. *In re Marriage of Goodell*, 130 Wn. App. 381, 122 P.3d 929 (2005) (declining to award attorney fees where neither party was the substantially prevailing party).

We affirm the judgment of the trial court and refuse to award fees and costs on appeal.

_____
Sweeney, J.

I CONCUR:

_____
Brown, J.

22

No. 30323-3-III

SIDDOWAY, A.C.J. (dissenting) — The outcome of this trial turned substantially on the trial court's decision to admit the testimony of Fred Chandler, given in a different case tried 15 years before this one and over 4 years before Britton and Lynnette Pettit acquired their property. I agree with the majority that the trial court acted within its discretion in concluding that the defendants in that case—Carl and Donna Thomsen—had an opportunity and similar motive to cross-examine Mr. Chandler concerning the location, use, and time of construction of what he contended was a boundary fence around his ranch. But the Pettits were not parties to that suit. The Thomsens were not the Pettits' "predecessor in interest" as that term has usually been understood. "[I]t is generally unfair to impose upon the party against whom . . . hearsay evidence is being offered responsibility for the manner in which the witness was previously handled by another party." H.R. REP. No. 93-650, at 15 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7075, 7088. It was error, in my view, to treat ER 804(b)(1)'s reference to "the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest" as adding nothing meaningful to the rule, and was therefore an abuse of discretion to admit Mr. Chandler's testimony.

A number of federal cases support what Eddie and Sharon Acord urge as the

"'practical and expedient view'" that a prior party with a like motive to develop

testimony about the same material facts "'is, in the final analysis, a predecessor in

interest to the present party.'" Br. of Resp'ts at 26 (internal quotation marks omitted)

(quoting *Dykes v. Raymark Indus., Inc.*, 801 F.2d 810, 815-16 (6th Cir. 1986)). The

Third, Fourth, and Sixth Circuit Courts of Appeal have adopted this reading; no federal

circuit court has explicitly rejected it.[1] *See, e.g., Dykes*, 801 F.2d at 815-17 (quoting *Clay*

*v. Johns-Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983) (quoting *Lloyd v.*

*Am. Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir. 1978))); *Horne v. Owens-Corning*

*Fiberglass Corp.*, 4 F.3d 276, 283 (4th Cir. 1993); *but cf. In re Screws Antitrust Litig.*,

526 F. Supp. 1316, 1319 (D. Mass. 1981) ("reluctance" to expansively define a

predecessor relationship "is justified"); *Acme Printing Ink Co. v. Menard, Inc.*, 812 F.

Supp. 1498, 1526 (E.D. Wis. 1992) (adopting a "narrower construction" of the

party/predecessor requirement); Mark Lawrence, *The Admissibility of Former Testimony*

*Under Rule 804(b)(1): Defining a Predecessor in Interest*, 42 U. MIAMI L. REV. 975

(1988) (challenging the interpretative trend as not meaningfully ensuring fairness in the

use of prior depositions). In *Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340, 343 (6th Cir.

1985), the Sixth Circuit recognized that this practical and expedient view "has, in effect,

---

[1] Because the federal rule is identical to ER 804(b)(1), we can look to federal law when interpreting the state rule. *State v. DeSantiago*, 149 Wn.2d 402, 414, 68 P.3d 1065 (2003).

2

collapsed the two criteria into one test."

Some decisions included within this trend of authority have implicitly considered circumstances in addition to a prior party's like motive to develop testimony about material facts, however. In *Dykes*, for example, the Sixth Circuit affirmed a district court's decision to admit the same deposition that had been at issue in *Clay*: that of a medical director of Johns-Mansville Corporation, which a number of plaintiffs suffering from mesothelioma had offered against asbestos manufacturers who were not parties to the case in which it was taken. It doing so, it characterized the medical director's testimony as "the testimony of a very knowledgeable person who was aware of the historical development of the specialized subject matter under examination," noting that "nothing in the argument before us or before the district court challenges the accuracy of the historical statements made by [him]." *Dykes*, 801 F.2d at 817. It relied upon his essentially unchallenged and "unique position to discuss the scope of knowledge available to the industry during his 20-year tenure" as an "additional reason we believe it was not an abuse of discretion for the trial judge here to have admitted the deposition." *Id.* It concluded:

> Obviously, [FED. R. EVID.] 803 is not designed to deprive the opposite
> party of the historic right of cross-examination; rather, it is intended to
> permit parties to employ proof and testimony *which is essentially reliable*,
> cannot be effectively obtained in any other manner, and whose relevance
> *and probity* is such that its introduction outweighs the possible prejudicial
> value which may result from denying cross-examination.

3

*Id.* (emphasis added).

Although Washington adopted ER 804(b)(1) verbatim from the federal evidence rules, Washington decisions have not construed "predecessor in interest" as expansively as have these federal courts. The Acords have pointed to *In re Estate of Foster*, 55 Wn. App. 545, 554 & n.7, 779 P.2d 272 (1989) but the discussion in *Foster* was dicta inasmuch as the appellate court found the challenged testimony to be substantially duplicative of another witness's testimony, thereby making it unnecessary to determine whether the prior plaintiff had a similar motive and opportunity to develop the testimony—and unnecessary to mention the party/predecessor in interest requirement at all.[2]

Other Washington decisions applying the exception to the hearsay rule have treated "predecessor in interest," a term of art in substantive law, as defined in terms of a privity relationship.[3] In *Allen v. Asbestos, Corp.*, 138 Wn. App. 564, 579, 157 P.3d 406

---

[2] The Acords also relied on *Keene v. Edie*, noted at 77 Wn. App. 1068, 909 P.2d 1311 (1995) but as the Pettits correctly point out, the citation was improper. The opinion in that case was designated "not for publication" and was withdrawn from the bound volume. They finally relied on *Young v. Key Pharmaceuticals, Inc.*, 63 Wn. App. 427, 819 P.2d 814 (1991), but in that case the testimony was offered against Key, a party to the prior action, so the requirement that the evidence be offered against a party or predecessor in interest was not at issue.

[3] *See Lloyd*, 580 F.2d at 1191 (Stern, J., concurring) (stating that "it seems clear" that, as used in the rule, the term "was used in its narrow, substantive law sense" and may include privies in estate, in blood, in representation, and in law); *see also El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 855-56, 376 P.2d 528 (1962) (speaking of "predecessor in

(2007), Division One of this court held that the trial court properly excluded a deposition offered by a plaintiff against Uniroyal due to the plaintiff's failure to demonstrate that Raymark, a predecessor of Uniroyal, attended the deposition or examined the witness, stating that "[b]ecause the predecessor in interest exception requires the predecessor to have the opportunity to examine the witness and the deposition does not establish that this opportunity existed, the trial court did not err in not applying the exception."

In *American National Fire Insurance Co. v. B&L Trucking & Construction Co.*, 82 Wn. App. 646, 920 P.2d 192 (1996), *aff'd*, 134 Wn.2d 413, 951 P.2d 250 (1998), Division Two affirmed a trial court's decision to admit the transcript of a deposition of a witness in an earlier CERCLA[4] action that Northern Insurance Company, the insurer against whom the deposition was being offered, did not attend. The witness—Northern's insured—was deposed again in the later Washington action, in a deposition that Northern *did* attend. During the course of the deposition in the State action, a party presented Northern's insured with his CERCLA deposition, had him adopt it, and marked the deposition as an exhibit. The appellate court reasoned that Northern enjoyed the motive and opportunity to develop the CERCLA deposition intended by the party/predecessor

---

interest" and privity interchangeably in an adverse possession case); *OTR v. Flakey Jake's, Inc.*, 112 Wn.2d 243, 244, 770 P.2d 629 (1989) (using "predecessor" to connote contractual privity).

[4] Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

5

requirement of ER 804(b)(1): it had "the opportunity to question [the witness] concerning any statements he had made during that deposition" and "an opportunity to develop further testimony on points raised, or not raised, during the CERCLA deposition." *Id.* at 668. It was only because Northern was able (although chose not) to make inquiry, and because there is no temporal requirement in ER 804(b)(1), that the appellate court found no abuse of discretion in admitting the deposition.

Neither of these Washington decisions was brought to the attention of the trial court here. After carefully considering the issue based on the authority that was brought to its attention, the trial court ultimately relied on Professor Tegland's recognition of the broad interpretation given the federal rule by the Third Circuit Court of Appeals in *Lloyd.* Report of Proceedings (RP) at 7, 297; *see* 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ER 804(b)(1) at 470 (2011-2012 ed.).

A number of authorities have pointed out that the broad reading given the hearsay exception by the several federal circuits is difficult to reconcile with the history of the federal rule. As sent to Congress by the United States Supreme Court, the prior testimony exception to the hearsay rule would have admitted prior testimony if the party against whom the testimony was offered or a party "with similar motive and interest" had an opportunity to examine the witness. FED. R. EVID. 804(b)(1) advisory committee note. But the House Judiciary Committee objected to this formulation, for the unfairness

6

reason that I reproduce above ("'it is generally unfair to impose . . . hearsay evidence'"). 2 MCCORMICK ON EVIDENCE § 303, at 350 (Kenneth S. Broun ed., 6th ed. 2006) (quoting H.R. REP. No. 93-650, at 15). Accordingly, the judiciary committee "substituted a requirement that '*the party against whom the testimony is now offered, or* in a civil action or proceeding a *predecessor in interest*, had an opportunity and similar motive' to examine the witness, and this version of the rule was enacted." *Id.* (first emphasis added) (footnote omitted).

For its part, the Senate Judiciary Committee characterized the difference between the version transmitted by the Supreme Court and that developed by the House Committee as "'not great,'" rounding out a legislative history that "has left little concrete guidance in determining congressional intent." *Id.* at 351 (quoting S. REP. No. 93-1277, at 28 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7074; citing 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 492, at 792 (2d ed. 1994)). McCormick concludes that "those courts that have read the language to mean no more than the general requirement that the prior party have a similar interest appear to have misconstrued the provision," even if, "interpreting the actions of Congress to require a strict privity approach, while not unreasonable, appears too rigid." *Id.* at 352 (footnotes omitted); *accord Lloyd*, 580 F.2d at 1190 (Stern, J., concurring) (stating that to predicate admission on FED. R. EVID. 804(b)(1) "is contrary to the Rule's clear language and is foreclosed by its legislative history"); Lawrence, *supra.*

Given our task, which is to predict the meaning that our Supreme Court will attach to ER 804(b)(1), neither federal legislative history nor federal cases are controlling. *State v. Copeland*, 130 Wn.2d 244, 258-59, 922 P.2d 1304 (1996) (federal case law interpreting a federal rule does not bind Washington courts "even where the rule is identical"). I reject the Acords' position that our Supreme Court will read the party/predecessor requirement as adding nothing to the Washington rule. I have already addressed the decisions of Divisions One and Two that have given "predecessor in interest" its substantive law meaning. In addition, the law of evidence in Washington predating the 1979 adoption of the evidence rules provided that prior testimony could be admitted only if it was given in an action or proceeding between the same parties or, in the case of Washington common law, "'that the party against whom the evidence is offered, or his privy, was a party on the former trial.'" *Finn v. Drtina*, 30 Wn.2d 814, 820-21, 194 P.2d 347 (1948) (internal quotation marks omitted) (discussing former Rem. Rev. Stat. § 1247 and quoting the common law rule as stated in 16 Cyc. *Evidence* 1088 (1905)). I see no reason to believe that in adopting ER 804(b)(1) (with its express reference to a party/predecessor requirement) our Supreme Court intended to dispense with the historical requirement that a party required to contend with testimony it cannot cross-examine must at least have had a privity relationship with the prior proceeding.

Also relevant in construing the prior testimony exception is our Supreme Court's rejection of the residual hearsay exception that exists in the federal rules. Several federal

8

judges have concluded that the federal residual exception is, or may be, the only proper basis for admitting prior testimony where FED. R. EVID. 804(b)(1)'s party/predecessor requirement is not met. *See Lloyd*, 580 F.2d at 1190 (Stern, J., concurring); *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 462 (5th Cir. 1985). Washington has continually decided against adopting a residual hearsay exception. Former ER 803(b) cmt., 804(b)(5) cmt. (1979) (91 Wn.2d at 1171, 1174).

ER 102 provides that the evidence rules shall be construed, among other ends, to secure fairness in administration, to the end that the truth may be ascertained and proceedings justly determined. To read the party/predecessor requirement out of the former testimony exception to the hearsay rule places a party at the mercy of a stranger's trial of a different case, without a sufficiently high standard for reliability that would make use of the prior testimony fair. The prior testimony exception is the only exception in ER 803 and 804 that is not based on characteristics of the statement itself that make it especially reliable. Apart from the testimonial oath (which is not sufficient to render a statement nonhearsay[5]) there is nothing about a witness's direct testimony in a prior action that is inherently reliable. Such a witness will frequently be a partisan. One must therefore depend for reliability on the thoroughness of a prior party's investigation and preparation and the quality of its cross-examination. Yet testing for admissibility solely

---

[5] *See* ER 801(c) (defining hearsay broadly enough to include prior statements under oath).

9

by examining the prior party's "similar motive and opportunity" to cross-examine does not test for this preparation and quality adequately, if at all.

Perhaps this shortcoming has been overlooked because it did not present a problem in the federal cases. In several of the key asbestos cases in which federal courts have broadly construed the meaning of "predecessor in interest," the facts addressed by the testimony were undisputed. Asbestos manufacturers against whom the evidence was offered were presumably well-positioned to identify and present any contradictory evidence. Given the stakes involved and the caliber of the law firms, it may be safe to assume that the district courts had an unstated confidence in the thoroughness with which cross-examination was prepared and conducted by the law firms defending prior actions.

Here, by contrast, Mr. Chandler's testimony was not unchallenged. The Pettits called Mr. Chandler's son, Brian, and his stepdaughter, Jill, both of whom disputed key parts of their late father's (or stepfather's) testimony.[6] The trial court found that Mr. Chandler was in poor health at the time of the 1996 trial (he died in 1997), could not hear, and was easily confused. Yet the lawyer for the Thomsens interposed no objections during the course of his direct examination in the 1996 trial—this, despite the fact (pointed out by the lawyer for the Pettits) that the direct examination was often leading. Having determined that the Thomsens had a similar motive and opportunity to cross-

---

[6] For clarity and consistency, we refer to Brian Chandler and Jill Metlow by their first names. We intend no disrespect.

10

examine Mr. Chandler, the trial court felt constrained to admit the testimony even while

acknowledging that Mr. Chandler was not cross-examined in 1996 with the benefit of the

preparation and thoroughness he would have expected from the Pettits' lawyer.[7]

In arriving at its factual findings, the trial court ultimately accepted Mr. Chandler's

testimony over that of his son and stepdaughter because Brian was a child in 1974 (the

year in which Mr. Chandler testified he built and thereafter maintained the fence) and Jill,

a teenager in 1974, moved away a few years later, living in the vicinity but no longer at

the family home. While it was not unreasonable for the court to attach greater weight to

---

[7] The trial court observed,

> I'm looking here at *Tegland* at page 191 in the same volume, quotation that "The party against whom the evidence is offered or a predecessor in interest must have an opportunity and similar motive in the former proceeding to develop the declarant's testimony by direct, cross or redirect". So opportunity, well yes there was an opportunity. There was a cross examination. Now similar motive, well, you know, it's—it's not a—it's not a thorough or complete cross examination that's required under the rule. It's not one that—that would be made by [the Pettits' lawyer], which would have been thorough and complete and well thought out in advance, but it's—it's what this language says at 191 and 192, "... an opportunity and similar motive ...". Well, the motive—and that's the language I have to ask and the motive would be similar here. The motive by [the Thomsens' lawyer] would be to call into question what Mr. Chandler was saying that he could remember. So when I go through this transcript and I've been through it now two or three times, I do find passages here and—and I acknowledge that there's some inaudible passages, there's some inartful questions, but, you know, just to go through this quickly.

RP at 298-99. At this point, the trial court proceeded to identify questions posed by the Thomsens' lawyer raising matters that the Pettits' lawyer would likely have inquired about as well.

the testimony of a witness who was an adult in 1974, the credibility determination

highlights a further aspect of unfairness in admitting the testimony in this case. The

Acords knew as early as 1994 that they had boundary issues with their neighbors over the

fence line. They knew that the issues were not only with the Thomsens, but also with the

Pettits' predecessor, Leigh Robertson, who had bulldozed part of the fence and, in 1995,

ran Ed Acord out of the contested area with a gun when he attempted to rebuild the

corner and fence. As the trial court put it, "she was very public about her position, even

violent about it." RP at 283. Yet when the Acords brought their action against the

Thomsens in 1995—when there might have been more contemporaries of Mr. Chandler

available to dispute his characterization of his actions in 1974—they elected not to sue

Ms. Robertson, deferring resolution of that boundary dispute for 16 years instead.[8]

I will agree that "predecessor in interest" as used in ER 804(b)(1) might

---

[8] In a distinguishable context, but one presenting similar fairness concerns, the United States Supreme Court unanimously rejected "virtual representation" as an adequate basis for nonparty preclusion, noting that the application of preclusion to nonparties "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor v. Sturgell*, 553 U.S. 880, 892-93, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008) (quoting *Richards v. Jefferson County*, 517 U.S. 793, 798, 116 S. Ct. 1761, 135 L. Ed. 2d 76 (1996)). Here, of course, no one argued that the Pettits should be bound by the outcome of the Acord/Thomsen suit. But their own outcome substantially depended on the testimony of a key witness whom they never had the opportunity to cross-examine. The majority of this court characterizes Mr. Chandler's testimony as "central to the Acords' claim of adverse possession," a characterization with which I agree. Majority at 8. When the Pettits moved the trial court for a directed verdict, the trial court recognized that its decision whether to admit Mr. Chandler's testimony could be decisive. RP at 262, 282.

12

reasonably be construed more broadly than substantive privity in light of the stated purpose of the evidence rules. *See* ER 102 (purposes of the rules include "promot[ing] growth and development of the law of evidence to the end that the truth may be ascertained"). But a broadened reading should require that the proponent of the prior testimony demonstrate the minimal fairness that was the express reason for amending the federal rule to require that prior testimony be admitted only against parties or their predecessors in interest. It could be construed to require, for example, not only that a prior party had a similar motive and opportunity to cross-examine the prior testimony, but also that the testimony is either sufficiently free from controversy, or was cross-examined sufficiently effectively (even if not perfectly), as to make its use against the present party fair.

In this case, the Acords rely instead solely on federal cases and their argument (unsupported, in my view) that the "predecessor in interest" aspect of our Washington rule has not been rigidly applied. Because I find their position irreconcilable with the rule and with Washington case law, I would find that the trial court erred and abused its discretion in admitting the testimony.

Siddoway, A.C.J.

13