# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| PHYLLIS Y. RAINWATER, | No. 52757-0-II |
| Appellant, | |
| vs. | UNPUBLISHED OPINION |
| RAINSHADOW STORAGE, LLC, a Washington Limited Liability Company, | |
| Respondent, | |
| JOHN R. DICKINSON and LORI R. DICKINSON, dba, WE DIG IT; LIBERTY NORTHWEST INSURANCE CORPORATION, Policy No. 1BKS(13)55005672 | |
| Defendants. | |

MAXA, J. – Phyllis Rainwater appeals the trial court's dismissal on summary judgment of a lawsuit she filed against her neighbor to the east, Rainshadow Storage, LLC. The case involves ownership of a strip of land between Rainshadow's legally described western boundary and a line of trees approximately five to six feet east of that legal boundary.

Shortly after purchasing the eastern parcel, Rainshadow cut down the trees and removed wire fencing attached to the trees and wooden fencing to the east of the legal boundary. Phyllis[1] filed a lawsuit to quiet title to the property up to and including the tree line, claiming that she had

---

[1] To avoid confusion between the parties, this opinion refers to Phyllis Rainwater and her late husband Gene Rainwater by their first names. No offense is intended.

acquired title to that property by adverse possession and through mutual recognition and acquiescence with Rainshadow's predecessors in interest, the Jarmuths. She also requested damages under the waste statute, RCW 4.24.630(1), for damage to the land and trees as a result of Rainshadow's activities.

The trial court granted Rainshadow's summary judgment motion, ruling as a matter of law that Phyllis had not established the elements of adverse possession or mutual recognition and acquiescence. The court also awarded Rainshadow attorney fees under RCW 7.28.083(3), RCW 4.24.630(1), and CR 68.

We hold that (1) the trial court erred in granting Rainshadow's summary judgment motion on Phyllis's adverse possession claim because Phyllis established genuine issues of fact regarding whether she and her husband actually possessed the disputed area and whether her adverse use spanned the requisite 10-year period; and (2) the trial court did not err in granting Rainshadow's summary judgment motion on Phyllis's mutual recognition and acquiescence claim because she failed to establish a genuine issue of fact regarding whether the Jarmuths acquiesced in the tree line as the true boundary; and (3) because we reverse on the adverse possession claim, the trial court's award of attorney fees to Rainshadow must be reversed.

Accordingly, we reverse the trial court's order granting summary judgment in favor of Rainshadow on the adverse possession claim, affirm the trial court's order granting summary judgment in favor of Rainshadow on the mutual recognition and acquiescence claim, and reverse the trial court's award of attorney fees to Rainshadow.

## FACTS[2]

*Background*

In April 1988, Roger and Helen Clark purchased the property on Strawberry Lane in Sequim that Phyllis now owns. The property consisted of a house and an open pasture area. A line of evergreen trees near the property's eastern boundary, planted in a row running north to south, existed as early as 1990. From 1991 to 2003, the Clarks maintained and mowed the pasture area up to the trees. The Clarks also installed approximately eight to 12 automatic sprinkler heads in the pasture area on the west side of the tree line, as close as four to five feet from the trees. The sprinklers watered both the pasture and the trees.

Dale and Troye Jarmuth bought the property directly to the east of the Clarks' property in 1993. Approximately 25 to 35 feet east of the tree line was an open drainage ditch that also ran north to south. Between the line of trees and the drainage ditch was an area of dense, tall bushes and brambles that the Jarmuths intentionally kept in a natural state. The Jarmuths never entered the area between the ditch and the line of trees.

*Rainwaters' Purchase and Use of the Property*

Phyllis and her husband Gene Rainwater purchased the Strawberry Lane property from Roger Clark's estate in June 2003 and lived there until 2013. Phyllis and Gene lived at the property in the summer months and spent their winters in Arizona. At the time Phyllis and Gene purchased the property, the line of trees had grown and completely blocked the view to the east. The trees were large, mature, and situated close together. Their limbs extended outward several

---

[2] Because this case was dismissed on summary judgment, we view the facts in the light most favorable to Phyllis, the nonmoving party.

feet over the edge of the pasture. While they lived there, Phyllis and Gene would move a bench within two feet of the line of trees so they could enjoy the surroundings.

In 2003, Phyllis and Gene agreed to let their neighbors to the south, Glen and Donna Gast, graze their miniature horses in the pasture. Gene and Glen Gast installed wire mesh fencing along the tree line, physically attaching the fencing to the westerly side of the tree trunks. This probably involved trimming some of the limbs. The fencing's purpose was to keep the horses contained. The horses remained in Phyllis and Gene's pasture until the Gasts sold them in 2005. The wire fencing attached to the trees was not removed.

In 2007, Gene and Glen Gast built a wooden fence running west to east at the entrance to Phyllis's and Gene's property along the southern property line. It extended seven feet to the east of the legally described western boundary line of Rainshadow's property. The wooden fence attached to preexisting wire fencing going north to the tree line. The new wooden fence included an entrance gate. The wooden fence and the wire fencing completely enclosed the eastern boundary of the pasture.

Phyllis and Gene maintained the area next to the line of trees. Gene started mowing the pasture area in 2003, although he did not have to mow while the horses were grazing in the pasture because they kept the grass down. Both Glen Gast and Donna Gast stated that Gene would mow up to the wire fence area. Both also stated that Gene mowed up to the tree line. They later stated that Gene probably mowed only up to several feet away from the trees because grass did not grow under the trees and the limbs would get in the way. Gene also pruned the trees for four or five years.

By contrast, the area to the east of the line of trees on the Jarmuths' property was not maintained. That area was covered with weeds, berry bushes, and brambles. Troye Jarmuth

4

described the area as thick with evergreen trees, bushes, and wild bramble. In 2007, a contactor removed all the brush during an irrigation project. After that, the Jarmuths allowed the area to return to its natural state.

In June 2013, Phyllis and Gene listed their property for sale and moved to Arizona because of Gene's declining health. Gene did not do any maintenance in the summer of 2013 because of his health.

Phyllis and Gene's home was not occupied from the summer of 2013 until the fall of 2016. In their absence, Phyllis paid real estate taxes and insurance on the property, locked the entry gate, kept the power on, and had the lawn mowed. However, the pasture area became increasingly overgrown in the years after Phyllis and Gene's 2013 departure for Arizona. During this time there was no maintenance of the pasture. The area around the trees also became overgrown.

At some point after Phyllis and Gene returned to Arizona, their mortgage company concluded the property was abandoned and started foreclosure proceedings. The mortgage company stopped the action after Phyllis explained that she intended to return to the property after Gene's illness or death.

Gene died in December 2014. Phyllis stayed at the property for a few months during the fall of 2016.

*Rainshadow's Purchase of Jarmuths' Property*

In February 2017, the Jarmuths had their property surveyed in anticipation of subdividing it into two lots. The survey placed the western boundary of the property roughly five to six feet west of the line of trees. Rainshadow purchased the western lot in February, intending to build and operate a self-storage facility there.

Rainshadow removed the line of trees – about 20 trees – along the western property line. Rainshadow also removed the wire fencing and seven feet of the wooden fence Gene had installed in 2007 that extended onto Rainshadow's property. Rainshadow did not contact Phyllis before removing the trees.

*Phyllis's Lawsuit*

In June, Phyllis filed a lawsuit against Rainshadow to quiet title to the roughly five to six feet between Rainshadow's surveyed western boundary and the location of the line of trees, as well as for ejectment and damages under RCW 4.24.630. Phyllis alleged that she had acquired title to the disputed area under either adverse possession, mutual recognition, estoppel, or acquiescence. She also sued John and Lori Dickenson dba We Dig It for damages, alleging that they had removed the trees.

Dale Jarmuth testified in a deposition that he believed his "western boundary was where the irrigation ditch was and the [line of] trees. . . . the property line was -- from where the ditch was, it was approximately 25 to 30 feet west of the ditch." Clerk's Papers (CP) at 46-47. He later clarified that he did not know whether the boundary was to the west of the line of trees, but that it would be "[a]bout where the trees were." CP at 49. He understood that some of the trees were on his property and he assumed some were on the Rainwaters' property. Troye Jarmuth testified that "There were a lot of trees back there" and that no one ever told her that " 'the trees from 10 feet, these ten trees are yours and those ten trees are not yours.' " CP at 144. She also stated in her declaration that upon completion of the county's irrigation project, she and her husband let their western boundary line return to its natural state again.

Phyllis retained Terry Curtis as a photogrammetry expert. Curtis reviewed aerial photographs and other information concerning Phyllis and Rainshadow's properties. He

reviewed aerial imagery from the Department of Natural Resources dating from 1990-2005 and Google Earth images from 1994-2017. Curtis stated:

> The tree line near the common boundary existed as early as 1990 and consisted of a row of approximately 16 or 17 individual trees that ran in a straight line in a north-south direction. . . . In the 1990 aerial photography (Exhibits 6 and 7) these trees appear to average approximately 8 to 10 feet tall, although there is some variation in individual heights. . . . This tree line persisted through all the aerial photographs up through the 2016 Google Earth imagery, and the trees were removed sometime between the 2016 and 2017 photography.

CP at 279. Curtis concluded:

> Land use on the Phyllis Rainwater parcel shows occupation and use of the area extending eastward all the way up to the tree line since at least the 1994 aerial photography and continuing through the 2016 imagery. . . . The eastern portion of the Phyllis Rainwater parcel consists of field grass and appears to have been possibly used for pasture or hay. It has been used and maintained at level that kept the area in field grass and prevented the ingrowth or encroachment of brush, brambles or woody vegetation.

CP at 280. Curtis stated further that

> The use and occupation of the land by the Phyllis Rainwater parcel extended all the way up to the tree line from at least 1994 until the trees were removed in early 2017. . . . The use of the land by the Jarmuth/Rainshadow Storage parcel ended 15-20 feet to the east of the tree line due to the former drainage ditch and a band of dense brush, bramble and small trees.

CP at 282-83.

In November 2017, Rainshadow made Phyllis an offer of judgment under CR 68, which she rejected. Rainshadow then moved for summary judgment. The trial court granted the motion, ruling that Phyllis had not provided sufficient evidence to establish maintenance of the disputed area over a 10-year period or that both parties recognized and acquiesced to a boundary line other than the legal boundary line. Because the Dickensons dba We Dig It were operating as Rainshadow's agent, the dismissal of Phyllis's claims related to them as well.

7

Rainshadow subsequently filed a motion for attorney fees. The trial court awarded Rainshadow attorney fees under RCW 7.28.083(3), RCW 4.24.630(1), and CR 68. The court entered a judgment dismissing Phyllis's claims, quieting title in Rainshadow for the disputed strip of property and awarding attorney fees to Rainshadow in the amount of $39,753.

Phyllis appeals the trial court's summary judgment order and award of attorney fees.

ANALYSIS

A. SUMMARY JUDGMENT STANDARD

Our review of a dismissal on summary judgment is de novo. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017). We review all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Keck*, 184 Wn.2d at 370. A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the case. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 864-65, 324 P.3d 763 (2014).

The party moving for summary judgment has the initial burden to show there is no genuine issue of material fact. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017). A moving defendant can meet this burden by establishing that there is a lack of evidence to support the plaintiff's claim. *Id.* Once the defendant has made such a showing, the burden shifts to the plaintiff to present specific facts that show a genuine issue of material fact. *Id.* Summary judgment is appropriate if a plaintiff fails to show sufficient evidence to establish the existence of an element on which he or she will have the burden of

proof at trial. *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 176

Wn. App. 168, 179, 313 P.3d 408 (2013).

B.      ADVERSE POSSESSION

Phyllis argues that the trial court erred in granting summary judgment to Rainshadow on

her adverse possession claim because there were genuine issues of fact as to whether she had

established each element of adverse possession with regard to the five or six foot strip of land

between Rainwater's western boundary line and the line of trees. We agree.

1.   Legal Principles

To establish adverse possession of a parcel of land, a claimant is required to demonstrate

that the possession was (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and

(4) hostile for a period of 10 years. *Ofuasia v. Smurr*, 198 Wn. App. 133, 143, 392 P.3d 1148

(2017). A claimant can rely on the use of a predecessor in interest to satisfy the 10-year

requirement. *Acord v. Pettit*, 174 Wn. App. 95, 103, 302 P.3d 1265 (2013). The party claiming

adverse possession bears the burden of proving each element. *Maier v. Giske*, 154 Wn. App. 6,

18, 223 P.3d 1265 (2010).

If all the elements of adverse possession are satisfied for 10 years, title automatically

vests in the adverse possessor. *Gorman v. City of Woodinville*, 175 Wn.2d 68, 72, 283 P.3d 1082

(2012). No quiet title action is required to vest title. *Id.* at 74. And the adverse possessor can

convey the property to another person without having title quieted in him or her. *Nickell v.

Southview Homeowners Ass'n*, 167 Wn. App. 42, 51, 271 P.3d 973 (2012).

When establishing the boundary of an adversely possessed parcel, the trial court need not

find a clearly etched line, but rather may project one between objects where reasonable and

logical to believe the claimant's use of the land was open and notorious. *Riley v. Andres*, 107

Wn. App. 391, 396, 27 P.3d 618 (2001). This demarcation may include ground around areas where direct evidence shows actual possession when reasonably necessary to settle a boundary dispute. *Lloyd v. Montecucco*, 83 Wn. App. 846, 853-54, 924 P.2d 927 (1996).

> 2.   Exclusive Possession

Phyllis argues that her use of the disputed area was exclusive because there is no evidence that anyone other than Phyllis and Gene occupied the disputed area or claimed the line of trees as their own. We agree that there was a genuine issue of fact regarding exclusive possession.

For possession to be exclusive, the claimant must possess the parcel as an owner would. *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). The exclusivity requirement for adverse possession does not require that the claimant's possession be "absolutely exclusive," but "must be of a type that would be expected of an owner under the circumstances." *Id.* at 174. "Important to a consideration of what use an owner would make are the nature and location of the land." *Id.*

To the extent that Phyllis actually possessed the disputed strip of property (discussed below), there is no question that her possession was exclusive as compared to the Jarmuths. The Jarmuths admitted that they had never been anywhere near the tree line. They certainly did not exercise any dominion or control over the disputed area. Conversely, Phyllis and Gene used and maintained the disputed area.

Rainshadow argues that Phyllis cannot establish exclusivity because the Gasts used the property to graze their miniature horses from 2003 to 2005. But Phyllis and Gene acted as exclusive owners of the disputed area by agreeing to allow their neighbors to graze horses on

their pasture land. Their possession was still exclusive because the Gasts' use was only with their permission. There was at least a question of fact on that issue.

We conclude that Phyllis presented a genuine issue of fact on the exclusivity requirement.

3. Actual and Uninterrupted Possession

Phyllis argues that she had actual and continuous possession of the disputed property up to the tree line. We agree that there were genuine issues of fact regarding actual and uninterrupted possession.

a. Area of Possession

For adverse possession to apply, the claimant must have actual possession of the disputed property. *See Ofuasia*, 198 Wn. App. at 143. In order to establish possession of the disputed property, an adverse possession claimant may show use or maintenance of the property. *See*, *e.g.*, *id.* at 144-45 (installation of a fence and landscaping of the disputed area); *Maier*, 154 Wn. App. at 19 (improved, landscaped, and maintained the disputed area); *Lingvall v. Bartmess*, 97 Wn. App. 245, 254, 982 P.2d 690 (1999) (landscaped, mowed, and maintained the disputed area); *Anderson v. Hudak*, 80 Wn. App. 398, 404, 907 P.2d 305 (1995) (evidence of usage "include[s] acts such as clearing land, mowing grass, and maintaining shrubs and plants").

The key issue here is what property Phyllis allegedly possessed. Phyllis argues that she and Gene possessed and maintained the pasture up to the line of trees, which would include the disputed strip of property. Rainshadow argues that there is no evidence that Gene maintained up to the line of trees, and instead relies on the testimony of the Gasts that Gene only mowed to within several feet west of the tree line, which would not include the disputed property.

The evidence is somewhat contradictory regarding whether Gene maintained the pasture area to the tree line or to some line further west. Phyllis stated, "We maintained our property

including the area next to the east tree line which we referred to as the pasture." CP at 386. In his declaration, Glen Gast stated, "Gene would mow up to the easterly fence area during the growing season." CP at 451. Donna Gast made the identical statement.

In his deposition, Glen Gast stated that Gene would mow up to the trees, and that the area was "maintained and mowed up to the tree line." CP at 129. He confirmed that there was "no [] grass or weeds up to the tree line." CP at 124. On the other hand, Glen Gast also stated that Gene would only mow up to about 10 feet from the trees because the grass did not grow close to the trees. And referring to a photograph, he acknowledged that Gene would only mow to within several feet of the trees because there were pine needles and grass did not grow well there.

In her deposition, Donna Gast stated that Gene mowed up to the tree line. She suggested that before Phyllis and Gene moved to Arizona, Gene maintained up to the line of trees. However, she acknowledged that Gene probably did not mow any closer than several feet to the west of the tree line because of overhanging limbs and the fact that there was little grass close to the trees.

Curtis, Phyllis's aerial photograph expert, concluded "The use and occupation of the land by the Phyllis Rainwater parcel extended all the way up to the tree line from at least 1994 until the trees were removed in early 2017." CP at 282.

In determining what Gene maintained, one other factor is relevant. The photos and the testimonial evidence show that the area up to the tree line was clear of any grass, weeds, or other vegetation. On the other hand, the area immediately to the east of the line of trees was an area of dense overgrowth, covered with weeds, berry bushes, and wild bramble. The contrast between the two areas gives rise to an inference that if Gene had not been maintaining up to the tree line, the area on the west side of the line of trees would have been overgrown as well. In fact, the area

12

to the west of the tree line did become overgrown once Gene moved to Arizona and stopped maintaining it.

Finally, the fact that the wire mesh fence was installed in 2003 and remained in place until 2017 provides at least some evidence that Phyllis and Gene possessed the area to the west of that fence. The fence, along with the line of trees, provided the eastern boundary of their property. This is particularly the case after 2007, when Gene installed the wooden fence and gate along the south boundary of their property and connected it with the wire fence attached to the line of trees to completely enclose the east boundary line.

We conclude that a genuine issue of fact exists as to whether Phyllis had actual possession of the disputed property up to the tree line.

   b. Uninterrupted Possession

Phyllis argues that her possession of the disputed area was uninterrupted because, even though she and Gene did not use the property constantly, they were the only ones to possess it in the manner an owner would. We agree.

"To interrupt adverse possession, there must be actual cessation of the possession." *Ofuasia*, 198 Wn. App. at 144. Continuous and uninterrupted use does not require constant use but only a demonstration that the claimant's use was " 'of the same character that a true owner might make of the property considering its nature and location.' " *Lee v. Lozier*, 88 Wn. App. 176, 185, 945 P.2d 214 (1997) (quoting *Double L. Properties, Inc. v. Crandall*, 51 Wn. App. 149, 158, 751 P.2d 1208 (1988)).

Here, Phyllis and Gene used the property as a home in the warmer months, spending their winters in Arizona. They occupied the property this way between June 2003 and June 2013, when they moved to Arizona because of Gene's declining health. When they lived on the

property, Gene mowed on an as-needed basis and pruned the trees, and Gene and Phyllis occasionally moved a bench next to the tree line to enjoy the surroundings. These uses are consistent with those of a true owner of pasture land used mainly in warmer months of the year.

Rainshadow again contends that the Gasts' use of the area from 2003 to 2005 interrupted Phyllis's possession. In *Ofuasia*, the adverse possession claimants rented out their house – including the disputed strip of land – for over two years. 198 Wn. App. at 140. This court rejected the defendants' argument that the claimants' absence from the property disrupted the adverse possession period. *Id.* at 145-46. The court noted that there was no evidence that the disputed property was unattended or no longer was held out as the claimants' property, or that the claimants had ceased possession. *Id.* at 145-46.

This same analysis applies here. Phyllis and Gene did not give up possession of the pasture by allowing the Gasts to use it with their permission. In addition, agreeing to allow a neighbor to graze horses on pasture land for a relatively brief period of time is a use a true owner might make of pasture land.

We conclude that Phyllis presented a genuine issue of fact on the uninterrupted possession requirement.

4. Open and Notorious Possession

Phyllis argues that her possession of the disputed area was open and notorious because she and Gene used the disputed area in a way that would lead a reasonable person to assume they owned it. We agree that there is a genuine issue of fact regarding open and notorious possession.

Possession is open and notorious if either (1) the title owner had actual notice of the adverse use[3] or (2) the claimant used the land in a manner that would make a reasonable person

_____

[3] There is no indication that the Jarmuths had actual notice of any adverse use.

believe the claimant owned it. *Nickell*, 167 Wn. App. at 50. The nature and location of the land in question are relevant to the claimant's type of use. *Shelton v. Strickland*, 106 Wn. App. 45, 50, 21 P.3d 1179 (2001).

The open and notorious element is satisfied where the use of property is such that " 'any reasonable person would assume' the claimant was the owner." *Maier*, 154 Wn. App. at 18-19 (quoting *Chaplin v. Sanders*, 100 Wn.2d 853, 862, 676 P.2d 431 (1984)). This court in *Anderson* noted that in successful claims of adverse possession, "the parties furnish[ ] some evidence of usage," that "include[s] acts such as clearing land, mowing grass, and maintaining shrubs and plants." 80 Wn. App. at 404 (emphasis omitted). In *Maier*, the adverse possessor testified that she had installed planks and built a berm, planted trees and shrubs between the planks, and generally landscaped and maintained the disputed area as her own. 154 Wn. App. at 19. The court held that this use "would cause a reasonable person to assume she was the owner." *Id.*

Here, Phyllis and Gene mowed and maintained the disputed area. Gene pruned the trees for four or five years. Gene and Phyllis occasionally moved a bench out to the tree line to enjoy the surroundings. And Gene and Glen Gast installed wire fencing along the line of trees that remained there until 2017. These are uses that at least create a question of fact as to whether a reasonable person would assume Phyllis and Gene owned the disputed area.

We conclude that Phyllis presented a genuine issue of fact on the open and notorious requirement.

5. Hostile Possession

Phyllis argues that her possession of the disputed area was hostile because she possessed it as its owner instead of in a manner subordinate to the Jarmuths' title. We agree that there is a genuine issue of fact regarding hostile possession.

Possession is hostile if the claimant treats the land as his own throughout the period, without regard to subjective intent. *Chaplin*, 100 Wn.2d at 860-61. "The hostility element 'requires only that the claimant treat the land as his own as against the world throughout the statutory period.' " *Maier*, 154 Wn. App. at 19 (quoting *Chaplin*, 100 Wn.2d at 860-61). Only the claimant's treatment of the land is relevant, not the claimant's subjective belief about his or her true interest in the land. *Maier*, 154 Wn. App. at 19.

Fences can be expressions of hostility, demonstrating the claimant's treatment of the land inside the fence " 'as [the claimant's] own as against the world.' " *Ofuasia*, 198 Wn. App. at 144 (quoting *Roy v. Cunningham*, 46 Wn. App. 409, 413, 731 P.2d 526 (1986)). A fence may be dispositive of hostile possession when it purports to be a boundary fence, as opposed to a random one, and where it effectively excludes neighboring owners " 'from the unused part of a tract otherwise generally in use.' " *Acord*, 174 Wn. App. at 107-09 (quoting *Wood v. Nelson*, 57 Wn.2d 539, 541, 358 P.2d 312 (1961)).

Here, there is evidence that Phyllis and Gene maintained the pasture up to the line of trees. Gene and Phyllis also moved a bench next to the tree line to enjoy the surroundings. These uses indicate that they were treating the disputed area as their own, not as belonging to the Jarmuths or anyone else. In *Lingvall*, the claimant adequately established the hostility element where she and her husband "cleared away brush and wild shrubbery . . ., landscaped, mowed, and maintained the area continuously and exclusively" for over 10 years. 97 Wn. App. at 254.

In addition, Gene installed a wire fence along the line of trees in 2003. The purpose of the fencing was to contain the miniature horses, not establish a boundary line. Therefore, the fencing is not dispositive of the hostility requirement. However, the fence would have prevented

16

anyone from entering the disputed area through the line of trees from the east. And the fencing is evidence that Phyllis and Gene were treating the property as their own.

We conclude that Phyllis presented a genuine issue of fact on the hostility requirement.

6.    10-Year Period

Rainshadow's primary argument is that even if Phyllis has established that her use of the disputed area satisfied the elements of adverse possession, none of the elements existed for the requisite 10-year period. We conclude that there is a genuine issue of fact as to whether Phyllis satisfied the adverse possession elements for a period of 10 years.

One question is when Gene stopped maintaining the disputed area. Gene started mowing in the summer of 2003. There is evidence that Gene maintained the pasture area up to the tree line until the summer of 2013, when he and Phyllis decided to list the property for sale and move to Arizona. Gene did not perform any maintenance in the summer of 2013. Therefore, there is evidence that Gene mowed the pasture area for over nine years.

However, Phyllis and Gene did not necessarily stop using or maintaining the disputed area the last time Gene mowed. The Gasts stated in their declarations that Gene mowed "during the growing season." CP at 451, 468. This means that the disputed area may not have even needed mowing in June 2013, 10 years after Gene started mowing. And there is an inference that the disputed area remained in a "maintained" state until Phyllis and Gene moved to Arizona in the summer of 2013, more than 10 years after Gene started mowing.

Rainshadow argues that Phyllis admitted that Gene only mowed for eight years. However, Phyllis only stated that Gene mowed as long as he was able and that she did not know when he stopped. Rainshadow apparently focuses on Phyllis's testimony that Gene began

17

receiving hospice care in 2011. But there was no evidence that Gene stopped mowing when he began receiving hospice care.

Another consideration is the fence Gene built in 2007. At that time, Gene built a wood fence that connected with the wire fencing attached to the line of trees. The wood fence and the wire fencing completely enclosed the eastern boundary of the pasture up to the line of trees. Arguably, at that point Phyllis and Gene did not need to keep maintaining the disputed area in order to continue their adverse use. The 2007 improvements potentially established elements of adverse possession.

We conclude that Phyllis presented a genuine issue of fact on the 10-year requirement.

7. Tacking with the Clarks' Use

Phyllis argues that even if her adverse use of the disputed area does not meet the 10-year requirement, the Clarks' use also was adverse and may be tacked to her adverse use to satisfy the 10-year requirement. We conclude that there is a genuine issue of fact as to whether the Clarks satisfied the adverse possession elements for a period of time.

"Tacking" periods of adverse possession with predecessors in interest "is permitted if there is a reasonable connection between the successive occupants that will raise their claim of right above the status of wrongdoer or trespasser." *Ofuasia*, 198 Wn. App. at 144. "The 10-year period may be shown by tacking a predecessor's adverse use [to the claimant's] if privity exists between them, and they have held continuously and adversely to the title holder." *Miller v. Anderson*, 91 Wn. App. 822, 827, 964 P.2d 365 (1998).

Here, there is evidence that the Clarks maintained the pasture area up to the line of trees. Glen Gast stated that when Phyllis and Gene purchased the property, the pasture was mowed up to where the trees were. Donna Gast testified that from 1991 to 2003, the Clarks maintained the

18

pasture up to the trees. In addition, Phyllis's expert Curtis determined from aerial photographs that the property "show[ed] occupation and use of the area extending eastward all the way up to the tree line since at least the 1994 aerial photography." CP at 280. And the Clarks installed sprinklers in the disputed area. This evidence is sufficient to at least create a question of fact as to whether the Clarks actually possessed the disputed area and satisfied the other elements of adverse possession.

We conclude that Phyllis presented a genuine issue of fact as to whether the Clarks' adversely possessed the property and therefore whether that possession can be tacked to Phyllis's adverse possession.

### 8. Summary

We conclude that Phyllis demonstrated genuine issues of fact on all the elements of adverse possession, including that her adverse use had lasted the requisite 10-year period. Accordingly, we hold that the trial court erred in granting Rainshadow's summary judgment motion on Phyllis's adverse possession claim.

The parties do not address the merits of Phyllis's waste claim under RCW 4.24.630. Because that claim depends on whether Phyllis adversely possessed the property at issue, we reverse the dismissal of that claim as well.

### C. MUTUAL RECOGNITION AND ACQUIESCENCE

Phyllis argues that the trial court erred in granting Rainshadow's summary judgment motion on her mutual recognition and acquiescence claim because there were genuine issues of fact as to whether she and the Jarmuths had agreed that the tree line was the boundary line separating the properties. We disagree.

1. Legal Principles

Property boundaries that are at odds with the true boundary, as shown by a survey, may be established through the doctrine of mutual recognition and acquiescence. *Lamm v. McTighe*, 72 Wn.2d 587, 591, 434 P.2d 565 (1967). This doctrine permits neighbors to adjust their property boundaries by oral acts or their acts on the ground. *Green v. Hooper*, 149 Wn. App. 627, 639, 205 P.3d 134 (2009). The doctrine of mutual recognition and acquiescence is an alternative claim to adverse possession, but is a separate and independent theory. *Id.*

A party claiming title to land under the mutual recognition and acquiescence doctrine must prove:

> (1) that the boundary line between two properties was "certain, well defined, and in some fashion physically designated upon the ground, *e.g.*, by monuments, roadways, fence lines, etc."; (2) that the adjoining landowners, in the absence of an express boundary line agreement, *manifested in good faith a mutual recognition of the designated boundary line as the true line*; and (3) that mutual recognition of the boundary line continued for the period of time necessary to establish adverse possession (10 years).

*Merriman v. Cokeley*, 168 Wn.2d 627, 630, 230 P.3d 162 (2010) (quoting *Lamm*, 72 Wn.2d at 593) (emphasis added). The party must prove these elements by clear, cogent, and convincing evidence. *Merriman*, 168 Wn.2d at 630. To meet this standard of proof, the evidence must show that the ultimate facts are highly probable. *Id.* at 630-31.

A claimant cannot establish acquiescence in a boundary line through unilateral acts. *Heriot v. Lewis*, 35 Wn. App. 496, 501, 668 P.2d 589 (1983). In the absence of an express agreement that a fence between properties is a true boundary line, " 'mere acquiescence in its existence is not sufficient to establish a claim of title to a disputed strip of ground.' " *Green*, 149 Wn. App. at 641-42 (quoting *Lamm*, 72 Wn.2d at 592). Instead, "an acquiescence must consist

in recognition of the fence as a true boundary line, and not mere acquiescence in the existence of a fence as a barrier." *Green*, 149 Wn. App. at 642.

    2.    Analysis

The primary question here is whether Phyllis demonstrated that she and the Jarmuths agreed that the true boundary between their properties was the line of trees. Phyllis argues that she and the Jarmuths agreed that the boundary line was either the line of trees or the natural area immediately east of the trees, and that the Jarmuths' awareness of the large wooden fence that Gene constructed in 2007 demonstrates their acquiescence to this boundary line.

The record does not show that Phyllis and Gene ever spoke to the Jarmuths about the line of trees or the true boundary between their properties. And Dale Jarmuth testified in his deposition that he never knew where the property boundary was, just that it was near the line of trees. Troye Jarmuth testified that no one ever told her that some of the trees were theirs and some were not theirs.

Even viewing the Jarmuths' statements in the light most favorable to Phyllis, they were at best uncertain about the location of their western boundary, and perhaps believed that some of the trees in the disputed area may have belonged to Phyllis. Contrary to Phyllis's assertion, these statements fail to establish the necessary clear and convincing proof that both parties acquiesced in the tree line as the true boundary.

Phyllis also argues that the aerial photographs of the properties demonstrate that she and the Jarmuths, as well as their predecessors in interest, maintained their respective properties up to the line of trees. But this argument is unconvincing because photographs alone cannot establish whether adjoining landowners recognized a tree line as the true boundary between their parcels

or whether one landowner merely acquiesced to the existence of the tree line as a barrier. *See Green*, 149 Wn. App. at 642.

We conclude that Phyllis failed to present sufficient evidence to create a genuine issue of fact regarding the elements of mutual recognition and acquiescence, particularly in light of the clear and convincing evidence standard. Accordingly, we hold that the trial court did not err in granting Rainshadow's summary judgment motion on this claim.

D.    AWARD OF ATTORNEY FEES

Because we reverse the trial court's dismissal of Phyllis's adverse possession and waste claims, we also must reverse the trial court's award of attorney fees to Rainshadow. Rainshadow no longer is the prevailing party on those claims, and therefore there is no basis for an award of attorney fees at least at this stage in the litigation.

However, because the issues may recur on appeal, we further address the recovery of attorney fees under RCW 4.24.630(1) and CR 68 and hold that Rainshadow is not entitled to attorney fees on those grounds even if it does prevail on Phyllis's claims.

1.    Standard of Review

Whether the trial court properly awarded attorney fees to Rainshadow requires this court to interpret statutory language. Statutory interpretation is a matter of law that we review de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). The purpose of statutory interpretation is to determine and give effect to the legislature's intent. *Gray v. Suttell & Assocs.*, 181 Wn.2d 329, 339, 334 P.3d 14 (2014). To determine legislative intent, we first look to the plain language of the statute, considering the text of the provision, the context of the statute, related provisions, and the statutory scheme as a whole. *Id.* We give words their usual and ordinary meaning. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283

(2010). Similarly, whether a trial court has authority to award attorney fees under a statute is an issue that we review de novo. *Niccum v. Enquist*, 175 Wn.2d 441, 446, 286 P.3d 966 (2012).

"When attorney fees are authorized, we will uphold an attorney fee award unless the trial court abused its discretion." *Workman v. Klinkenberg*, 6 Wn. App. 2d 291, 305, 430 P.3d 716 (2018). The trial court abuses its discretion when it exercises its discretion in a way that is manifestly unreasonable or based on untenable grounds or reasons. *Id.*

2. Award Under RCW 4.24.630(1)

Phyllis argues that the trial court erred in awarding Rainshadow attorney fees under RCW 4.24.630(1) because Rainshadow was not an "injured party" under that statute. We agree.

Phyllis's complaint sought damages under RCW 4.24.630 for damages to the trees and land after Rainshadow's removal of the line of trees. RCW 4.24.630(1) provides:

> Every person who goes onto the land of another and who removes timber, crops, minerals, or other similar valuable property from the land, or wrongfully causes waste or injury to the land, or wrongfully injures personal property or improvements to real estate on the land, *is liable to the injured party* for treble the amount of the damages caused by the removal, waste, or injury. . . . In addition, *the person is liable for reimbursing the injured party* for the party's reasonable costs, including but not limited to investigative costs *and reasonable attorneys' fees* and other litigation-related costs.

(Emphasis added.)

This statute establishes liability for three types of conduct: "(1) removing valuable property from the land, (2) wrongfully causing waste or injury to the land, and (3) wrongfully injuring personal property or real estate improvements on the land." *Clipse v. Michels Pipeline Constr., Inc.*, 154 Wn. App. 573, 577-78, 225 P.3d 492 (2010) (emphasis omitted). If the injured party shows that one of the three types of conduct occurred, the court can order the liable party to pay the injured party's attorney fees.

However, RCW 4.24.630(1) only provides reimbursement of attorney fees to "the injured party." Rainshadow was not an "injured party" because it did not allege that it had suffered any of the three types of conduct for which RCW 4.24.630(1) imposes liability. Based on the plain language of RCW 4.24.630(1), Rainshadow was not entitled to recover attorney fees under that statute.[4]

3. Award Under CR 68

Phyllis argues that the trial court erred by awarding Rainshadow attorney fees incurred after it made an offer of judgment because attorney fees are not recoverable as "costs" under RCW 4.24.630(1). We agree.

CR 68 provides a procedure for defendants to offer to settle cases before trial, aiming to encourage parties to reach settlements and avoid lengthy litigation. *Lietz v. Hansen Law Offices, P.S.C.*, 166 Wn. App. 571, 581, 271 P.3d 899 (2012). CR 68 provides for an award of "costs incurred after the making of the offer" to a defendant in cases where the defendant made an offer of judgment to the plaintiff that was larger than the judgment ultimately obtained. *Estep v. Hamilton*, 148 Wn. App. 246, 259, 201 P.3d 331 (2008).

Under CR 68, whether "costs" accrued after the offer of judgment includes attorney fees depends on the underlying statute. *Lietz*, 166 Wn. App. at 581. If the statute's definition of "costs" includes attorney fees, then the court may award the defendant attorney fees incurred after making the offer of judgment. *See id.* at 582.

---

[4] In *Standing Rock Homeowners Association v. Misich*, the court stated without analysis that attorney fees were authorized to the "prevailing party" under RCW 4.24.630(1). 106 Wn. App. 231, 247, 23 P.3d 520 (2001). However, in that case, the "injured party" prevailed at trial. *Id.* at 244, 247.

Rainshadow argues that CR 68 allows recovery of attorney fees here because RCW 4.24.630(1) defines "costs" to include attorney fees. However, as we conclude above, Rainshadow cannot recover attorney fees under RCW 4.24.630(1) because it is not an "injured party." Therefore, CR 68 logically cannot allow the recovery of attorney fees as costs in this case.

E.     ATTORNEY FEES ON APPEAL

Rainwater requests attorney fees on appeal under RCW 7.28.083(3). RCW 7.28.083(3) provides that a court may award all or a portion of costs and reasonable attorney fees to the prevailing party in an adverse possession action "if, after considering all the facts, the court determines such an award is equitable and just." Here, we hold that Rainshadow is not the prevailing party on appeal of the adverse possession claim. Therefore, Rainshadow is not entitled to attorney fees on appeal under RCW 7.28.083(3).

Phyllis requests attorney fees on appeal under RCW 7.28.083(3), RCW 4.24.630(1), and in equity. She is not entitled to attorney fees because the prevailing party on her adverse possession and waste claims is yet to be determined. We decline to award attorney fees on appeal based on equity.

## CONCLUSION

We reverse the trial court's order granting summary judgment in favor of Rainshadow on the adverse possession claim, affirm the trial court's order granting summary judgment in favor of Rainshadow on the mutual recognition and acquiescence claim, and reverse the trial court's award of attorney fees to Rainshadow.

No. 52757-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

SUTTON, A.C.J.

GLASGOW, J.